**HENDERSON CLAY PRODUCTS,**
Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 23771.

United States Court of Appeals
Fifth Circuit.

April 11, 1967.

Gewin, Circuit Judge, dissented.

Chas. W. Shaw, Henderson, Tex., R. Gordon Appleman, B. L. Bird, Fort Worth, Tex., Waldrop, Shaw & Colley, Henderson, Tex., Weeks, Bird, Cannon & Appleman, Fort Worth, Tex., of counsel, for appellant.

Mitchell Rogovin, Asst. Atty. Gen., Tax Div., Lee A. Jackson, Atty. Dept. of Justice, Washington, D. C., W. Wayne Justice, U. S. Atty., Tyler, Tex., Melva M. Graney, Thomas L. Stapleton, Attys., Dept. of Justice, Washington, D. C., Richard B. Hardee, Asst. U. S. Atty., of counsel, for appellee.

Before TUTTLE, Chief Judge, and JONES and GEWIN, Circuit Judges.

TUTTLE, Chief Judge:

This is the second appeal to this court which raises the problem of ascertain-

ing the proper base on which to determine the depletion allowance for an integrated miner-manufacturer of bricks processed from ball clay and from ordinary brick and tile clay.

The rates of depletion allowed by statute differ with respect to ball clay and brick and tile clay. The rate is 15% for the ball clay, whereas it is only 5% for brick and tile clay.

The legal issues respecting the two different types of clay differ also in the fact that it is undisputed in the record before us, and it has been earlier decided by us in United States of America v. Henderson Clay Products Company, 5 Cir., 324 F.2d 7, that there is a commercially marketable product, known as "shredded ball clay," in which market the taxpayer could have disposed of his mined ball clay, thus giving rise to the application of the statutory provision that the base for depletion is a figure that would represent either the "representative market or field price" of shredded ball clay, or, if none could be established, then the figure would be arrived at by taking the "representative market or field price" of the finished brick, minus the cost and proportionate profits attributable to the processes beyond those necessary to produce the shredded ball clay. The applicable statutes are found under the Internal Revenue Code of 1954.[1]

The question relating to the figuring of depletion with respect to the ordinary brick and tile clay is of a different kind. It is undisputed in this record that there is no marketable product following the extraction of the clay from the ground until the final completion of the manufacture of the clay into bricks. Until the passage of a new statute by the Congress of the United States in 1961, brick manufacturers dealing with ordinary brick clay were permitted to base their depletion on the gross income upon the sale of the finished product. See United States v. Cherokee Brick and Tile Co., 5 Cir., 1955, 218 F.2d 424, United States v. Merry Brothers Brick and Tile Company, 5 Cir. 1957, 247 F.2d 708, cert. denied 1957, 355 U.S. 824, 78 S.Ct. 31, 2 L.Ed.2d 38.

On September 26, 1961, Congress passed a statute which offered to brick and tile manufacturers an option to compute their taxes in a different manner. The taxpayer contends that it exercised the option with respect to the tax year in question. The government contends to the contrary. This is the only issue respecting the right of recovery by the taxpayer of the amount paid on the deficiency notice resulting from the depletion allowance on the brick and tile clay.

The tax year in question before the court here is the fiscal year ended March

1. "§ 611(a), General Rule—In the case of mines * * * there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate * * * " 26 U.S.C.A. § 611.

"§ 613, Percentage Depletion, (a) General Rule—In the case of mines, * * * (b) The allowance for depletion under section 611 shall be the percentage, specified in subsection (b) [15% here] of the gross income from the property, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50% of the taxpayer's taxable income from the property (computed without allowance for depletion) * * * "

"(C) Definition of gross income from property—For purposes of this section— (1), Gross income from the property— The term 'gross income from the property' means, in the case of a property other than an oil or gas well, the gross income from mining.

"(2) Mining—The term 'mining' includes not merely the extraction of minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of fifty miles * * * "

31, 1955. This court had before it, on an earlier appeal, a similar question with respect to the proper basis for computing the depletion on the ball clay for the fiscal years 1951, 1952, 1953 and 1954. In that case the record disclosed that the appellant used ball clay, as it still does, solely for the purpose of manufacturing bricks; that nevertheless during the life history of the clay products from the time the clay was taken from the ground until it was ready for the builder, it passed through a stage known as "shredded ball clay"; that there were clay miners, principally in a Kentucky and Tennessee mining area, who mined and sold shredded ball clay all over the United States, including the area in which Henderson had its clay mines; that the market price for such clay was $10.50 per ton; that, although Henderson sold its finished brick at $8.75 per ton, it claimed that under the teaching of United States v. Cannelton Sewer Pipe Company, 1963, 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581, it was entitled to take depletion on the $10.50 figure, or $1.75 per ton more than it received for finished brick.

This court determined that a price of $10.50 per ton for the admittedly marketable product, shredded ball clay, was not a "representative field price," as to a manufacturer of bricks who used a like grade and quality of clay for the manufacture of bricks which it sold for $8.75 per ton.

This second case comes to us following the filing of a refund suit by Henderson seeking a refund of the taxes paid for fiscal 1955 as distinguished from the prior cases which covered the years through fiscal 1954. The complaint in this case also alleged that there was a market for shredded ball clay at $10.50 a ton, as had the earlier complaints.

Nevertheless, the case coming to trial after the court decided the earlier case, the parties stipulated that the market price that was being obtained for shredded ball clay was $10.00 per ton, as contrasted with the $10.50 that had been proved as to the earlier years. The stipulation also established the fact that during fiscal 1955, Henderson sold its finished brick for $12.38 per ton, as contrasted to $8.75 per ton during the prior four years. Thus, Henderson sought to distinguish the facts of this case from the earlier case by reason of the fact that the final product, the finished brick, was sold by Henderson for $2.38 more per ton than the available market price for shredded ball clay.

However, while most of the facts were stipulated in the trial court, there were two circumstances testified to which have a significant bearing on the finding of the trial court that the 1955 case did not so far differ from the earlier cases as to warrant a finding by the trial court that depletion could be computed by Henderson on the $10.00 market price for shredded ball clay. These two circumstances are: (1) testimony by the president of the taxpayer that if Henderson had bought shredded ball clay at $10.00 per ton, delivered at its pug mill in Texas, instead of mining its own clay, it would just about have "broken even" on its operation.[2] (2) The record discloses that the sales by the Kentucky-Tennessee clay miners were of shredded ball clay and a further processed product, air-floated clay, and in his testimony, following evidence that Henderson could have sold shredded ball clay at $10.00, Mr. Bryce stated that he could not have competed with the Kentucky-Tennessee miners unless he had gone into the processing of shredded ball clay into air-floated clay, and that this would have

2. The question was asked of Mr. Bryce, the President: "How would Henderson Clay Products have come out if in 1955 it had purchased shredded ball clay, *laid down at its pug mill*, at $10.00 a ton, and made such clay into brick and sold it at $12.38 per ton, which it is stipulated is the average ton sales price of your brick?" Answer: "Well I asked that question to my accountant recently, and he said in the year 1955 that it would have been about a break even proposition." (Emphasis added.)

taken additional equipment which his company did not have.[3]

The problem for the court here, as in the last case, was, first, to determine whether a marketable product resulted at a stage following the removal of the clay from the pits and before the final finishing of the bricks, and, second, if it was determined that there was such a marketable product, to ascertain whether there was a "representative field price" that prevailed for such market, and, if there was no such representative field price, then to determine the gross income from mining by the proportionate profits method, as provided in the regulations.[4]

■ The *Cannelton* decision determined that the question whether a marketable product existed must be viewed industry-wide rather than from the viewpoint of the particular miner-manufacturer. The fact that a manufacturer of bricks or a clay pipe manufacturer did not himself sell the raw clay or the limestone or other unfinished products, did not preclude a finding that there existed a marketable product short of the final manufacturing process. It is clear here, as we held in our earlier decision, that in ball clay mining there is a commercially marketable product in the nature of shredded ball clay produced before the final manufacturing into brick commences. The first part of the problem is thus answered in the affirmative—that is, there is a commercially marketable mineral product which Henderson later processes additionally to produce its brick. We thus apply clause 3 of the Regulations to ascertain whether the term "gross income from the property" is to be found by using a representative market or field price or by using a proportion of profits computation. The *Cannelton* case does not aid us in this regard.

As we stated earlier, "We observe that in Cannelton the question was one of identifying the first commercially marketable product so as to mark the end of

3. "In selling the clay in the shredded stage, I use the same equipment—the shredders —that the ball clay people use; but had I been in the ball clay business, then I couldn't have gotten along by just selling shredded clay—I would have had to have had—would have to have pulverized it or air-floated it—the clay—which would have taken this other equipment that you mentioned, you see." Question: "And you did not have that—You did not put that extra equipment in in 1955, did you?" Answer: "I had no need for it. I wasn't using the * * *. I had * * *."

4. "The applicable Treasury Regulations are as follows: "Section 29.23(m)–1. Depletion of Mines * * * (e) As used in Sections 114(b) (3) and 114(b) (4) (A), and Sections 39.23(m)–1, to 39.23 (m)–19, inclusive, the term, 'gross income from the property' means the following:

"(2) In the case of a crude mineral product other than oil and gas, 'gross income from the property,' as used in section 114(b) (4) (A), means the gross income from mining. The term 'mining' as used herein includes not only the extraction of ores or minerals from the ground but also the ordinary treatment processes which are normally applied by the mine owners or operators to the crude mineral product after extraction in order to obtain the commercially marketable mineral product or products. * * *

"(3) If the taxpayer sells the crude mineral product of the property in the immediate vicinity of the mine, 'gross income from the property' means the amount for which such product was sold, but, if the product is transported or processed (other than by the ordinary treatment processes described below) before sale, 'gross income from the property' means the representative market or field price (as of the date of sale) of a mineral product of like kind and grade as beneficiated by the ordinary treatment processes actually applied, before transportation of such product (other than transportation treated, for the taxable year, as mining). If there is no such representative market or field price (as of the date of sale), then there shall be used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes (or, if the product in its crude mineral state is merely transported, the price for which sold) minus the costs and proportionate profits attributable to the transportation (other than transportation treated, for the taxable year, as mining) and the processes beyond the ordinary treatment processes. * * * "

the mining process for the purposes of Section 114(b) (4). The court held that commercial profitability was not relevant *in defining the product* which had passed sufficiently from its natural state so as to become marketable. The case was remanded to be treated according to Regulation 39.23(m)–1(e) (3); there is no indication that the proceedings in the Supreme Court have any bearing on this determination over and above the establishment of the 'product' on which the depreciation allowance is to be granted." (Emphasis added) 324 F.2d 7, 15.

We also said in our earlier case:

"The competitive market approach is to be used only if there is a 'representative market or field price' of an essentially similar product. The Regulation does not allow the indiscriminate use of any price of a product of like kind and grade, but requires the price to be representative; 'representative' should be interpreted to qualify the entire phrase 'market or field price' ".

■ We conclude that on any one of three different approaches we must affirm the determination by the trial court that the $10.00 price received by the shredded ball clay miners was not, as to Henderson, a representative market or field price.

The first approach is that suggested in the prior decision, where this court pointed out that substantial items of expenditure were made by the shredded ball clay miners by way of research, advertising and marketing, all of which became ingredients in the sales price of $10.00 per ton, whereas, Henderson did not engage in these expenditures as directed to the creation of, or filling, the market for shredded ball clay. Thus, the $10.00 price was more than "the representative market or field price (as of the date of sale) of a mineral product of like kind or grade as *beneficiated by the ordinary treatment processes actually applied*," because it represented a price that was substantially enhanced by expenditures other than for the "ordinary treatment processes actually applied." While it is true that the Kentucky-Tennessee ball clay miners could take the gross sales price, including costs of promoting and selling, as the gross income from the property, we pointed out in our earlier decision that these expenses which were not incurred by *this* taxpayer kept the $10.00 price from being representative as to it.

The second approach relates to the fact that Henderson, according to the testimony of its president, was not actually making one of the two products which it had to be prepared to market together in order to compete in the shredded ball clay market. Thus, the price of $10.00 achieved by the Kentucky-Tennessee miners was a price which resulted from their position that enabled them to supply not only shredded ball clay, but also air-floated clay. Without being able to supply the latter product, Mr. Bryce testified that his company could not have competed in the sales of shredded ball clay, presumably because the purchasers of one required the other as well. There is, therefore, no basis for the finding by the trial court that the market price in Texas for shredded ball clay was the same $10.00 realized in Kentucky and Tennessee.[5]

Finally, just as in our earlier opinion we found it incomprehensible that Henderson would buy shredded ball clay at $10.50 per ton to produce brick which it then sold at $8.75 a ton, so we determine that under the undisputed facts of this record, it is equally incomprehensible that Henderson would pay $10.00 for shredded ball clay at the mines in Kentucky and Tennessee, transport it to east Texas, and then process it into finished brick, where the testimony showed that if they were able to have the brick at

---

5. Although one witness did testify that Henderson could sell shredded ball clay in east Texas itself at $10.00 a ton, this testimony must be taken together with that of the president of the company who said that in order for it to have engaged in this market it would have had to add equipment to permit it to sell air-floated clay, which it did not have.

$10.00 laid down at their own pug mill, they would just about break even.

Not only is it evident that the $10.00 price would not be a "competitive" price, so far as Henderson was concerned if it had sought to compete with the Kentucky-Tennessee miners in selling shredded ball clay, it is also evident that it would be a price which, when added to the cost of processing the brick, would produce a final figure in excess of the $12.38 average sales price, for the finished brick for the year in question. In this connection, it is more than significant that Henderson, in a reply brief, specifically calls our attention to a proposed regulation dealing with this precise subject. This is quoted as paragraph 4 of Proposed Regulations, published 31 Fed. Regulations 9506 (July 13, 1966) dealing with "percentage depletion; rates; gross income from the property." Appellant characterizes these proposed regulations as "interesting as showing the meaning of 'gross income of the property.'" Then, following liberal quotations from the regulations, appellant says "These regulations present in clear and unmistakable language the views which appellant has sought to express in this case."

A quick glance at these proposed regulations indicates, however, that the quotations from the regulations stop short of that particular section which most clearly fits the circumstances of the appellant in this case. The following language was not included in the part of the regulations quoted in the appellant's brief:

> "(6) Limitation on gross income from mining computed under the provisions of this paragraph. No price shall be considered a representative market or field price for the taxpayer's ore or mineral if the sum of such price plus the costs of the nonmining processes which the taxpayer applies to his ore or mineral exceed the taxpayer's actual sales price of the product sold."

These proposed regulations are, of course, not binding until adopted by the Commissioner of Internal Revenue. Nevertheless, as indicated by appellant itself, they are strongly persuasive of the commissioner's view of the proper construction of the statute. Here appellant claims to concur with the commissioner's "view". If we were to accept appellant's flat statement that these proposed regulations "present in clear and unmistakable language the views which appellant has sought to express in this case," and include the language which is quoted above, as well as that which appellant included in its brief, then it is clear beyond a doubt from this record that the new regulations would preclude the inclusion of the $10.00 price of the Kentucky-Tennessee miners here as a representative market or field price within the contemplation of the statute. Without question this sum of the $10.00 price, plus transportation, plus "the costs of the nonmining processes which the taxpayer applies to his minerals" exceeded the "actual sales price of the product sold." In any event, this is the common-sense construction of the statute, which, whether it be finally adopted as a regulation or not, represents this court's view of the matter when dealing with hypothetical income of the taxpayer for the sale of products which it does not sell, and which includes items of expenditure which this taxpayer does not incur.

We turn finally to the attempted recovery of the payment made on account of the deficiency assessed against taxpayer because of its treatment of depletion on its ordinary brick and tile clay. With regard to this product, the Act of September 26, 1961,[6] provided for an election under subsection (c) for the purpose of applying section 613(c) of the Internal Revenue Code of 1954. The statute expressly provided that such election was to be made in such form and manner as the Secretary of the Treasury or his delegate should prescribe by regulations. The regulations, duly prescribed under this section, provided that an election must be made on or before Decem-

6. P.L. 87-312, 75 Stat. 674.

ber 11, 1961, for prior years. As an integral part of the election, section 1.9004–4 also required the filing of amended returns for the years to which the election was or could be applicable. The regulations required the filing of amended returns on or before March 31, 1962. It is not in dispute that the taxpayer knew of the requirement as to the filing of amended returns and of the cut-off date.

In effect, appellant argues that it made the election for the year 1961, and claims this was an effective compliance with the statute. It argues that the general language of the statute did not authorize the specific requirement of the regulations that it make its completed election for each year and that it file an amended return for each year. We think it too plain to require elaboration that the provisions in the regulations requiring the filing of an amended return for each of the years for which the election was sought to be applied was a valid regulation issued under the mandate of the statute and that the failure to file such amended return for the year in issue precludes the right of recovery, as determined by the trial court.

The judgment is affirmed.

GEWIN, Circuit Judge (dissenting):

This is another skirmish in the continual and constant battle waged by the Internal Revenue Service against the use of percentage depletion. The ferocity of the government's attempt to limit the scope and the availability of this tax advantage is diminished only by the equally continual and constant expansion of the concept of percentage depletion by Congress. The time has come for courts to give effect to Congressional enactments and to cease nullifying them in the name of Congressional intent.[1] Congress has made it clear through consistent legislative action that it believes that percentage depletion serves a functional purpose and is a desirable aspect of tax law. Since the percentage depletion was first incorporated in the tax structure in 1926, Congress has repeatedly increased the class of minerals entitled to percentage depletion until today virtually all mineral processors are entitled to percentage depletion. Further, the gradual but continual increase in the percentage allowed is additional evidence of Congressional dedication to the concept.[2] In my view it is not either the function or duty of the courts to supplant those legislative determinations with a judicial notion of proper tax policy by severely restricting and stultifying the clear legislative mandate. This decision is but a further example of that subjugating process.

I

This appeal involves the use of percentage depletion in two different situations, and raises two divergent issues of tax law. Both, however, substantially affect the availability and the amount of percentage depletion to which the taxpayer is entitled.

The first issue, before us for the second time, is whether the taxpayer must determine its "gross income from mining" for purposes of calculating its percentage depletion allowance for shredded ball clay under § 611, I.R.C.1954, 26 U.S.C. § 611 (1958) by the proportionate profits method or by the representative market or field price method. In an earlier opinion, United States v. Henderson Clay Products, 324 F.2d 7 (5 Cir. 1963), this Court held that for the years 1951–54 inclusive the taxpayer's "gross income from mining" was to be determined by the proportionate profits method. The government asserts that the earlier decision is dispositive of this aspect of the case. The taxpayer contends that our former decision was predicated on the unique factual circumstances which existed during those years, and that since

---

1. Cf. F.T.C. v. Dean Foods Co., 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802, 812 (1966) (Fortas, J. dissenting).

2. See 4 Mertens, Federal Income Taxation §§ 24.03–24.15 (1966). The discussion in Mertens is so complete and exhaustive it is unnecessary to attempt to further outline that history.

the essential facts in the instant case are substantially different, our earlier opinion is not controlling.

The second issue raised is whether the taxpayer is entitled to use the alternative method for calculating its depletion allowance for brick and tile clay provided by P.L. 87–312, 75 Stat. 674. The government argues that the taxpayer did not properly elect to use the alternative method because it failed to file amended returns for the years to which the statute applied as required by the regulations. The district court agreed with the government. The taxpayer asserts that insofar as the regulations require the filing of amended returns they are inconsistent with the statute and are invalid. The taxpayer further argues that the statutory provision requiring an election to utilize the provisions of P.L. 87–312 was satisfied when it notified the district director of the I.R.S. of its intention to avail itself of the alternative method, and timely filed a return for the year 1961, one of the years involved under the statute.

The majority agrees with the government's position on both issues, although it does not quite agree with the government's argument as to the first issue, and consequently holds that the appellant can not prevail in this suit for a refund.[3] I find the government's argument unpersuasive, and the majority opinion confusing and ill-conceived. With respect to whether the taxpayer must use the representative field or market price method or the proportionate profits method in calculating its percentage depletion allowance for shredded ball clay, it is clear that the taxpayer has proved the existence of a representative market price applicable to its operations and is therefore required under the regulation to use that method. Further, as to the brick and tile clay issue, it appears to me that the regulation requiring the filing

of an amended return for each year to which the statute applies so onerously burdens a taxpayer's access to a patently remedial statute that a clear conflict is created between the regulation and the statute. Therefore, the regulation must yield to the purpose of the statute.

## II

Henderson Clay Products (taxpayer) is an integrated miner-manufacturer of bricks; its clay pits and deposits contain both ball clay and brick and tile clay. The taxpayer extracts both varieties of clay by strip mining and then processes the clay into brick. The ball clay is removed from the pits and is shredded or disintegrated at the taxpayer's plant to a small manageable size— about the size of a walnut. This clay, known as shredded ball clay, is then stored for future use or processed immediately into brick. The district court found that the shredded ball clay was the first commercially marketable mineral product from taxpayer's clay pits and that there was a market for shredded ball clay in the United States.

The brick manufactured from the taxpayer's shredded ball clay during 1955 sold for an average of approximately $12.38 per ton of ball clay.[4] During 1955 the taxpayer sold no raw clay.

Most of the shredded ball clay mining in the United States is done in the Kentucky-Tennessee area. The mining operations of the non-integrated miners in this region are substantially the same as those employed by the taxpayer. These miners, in addition to selling shredded ball clay, also sell air-floated clay which is a further refined product. The district court found that the average prevailing price for shredded ball clay in the Kentucky-Tennessee area was $10.00 a ton f. o. b. the plant. It is agreed that the taxpayer's shredded ball clay is of a like kind and grade as that

---

3. The tax year involved is fiscal year 1955. The taxpayer's fiscal year runs from April 1 to March 31. Hereafter, reference to a tax year shall mean the fiscal year.

4. In 1955, the taxpayer sold 40,141.8 tons of ball clay in the form of brick for $621,150.09, or an average of approximately $12.38 per ton of ball clay.

mined by the Kentucky-Tennessee miners. The district court also found that there was a market for shredded ball clay in Texas and that had the taxpayer sold its clay it would have received $10.00 a ton for it. These findings are not contested by either of the parties. There was uncontradicted testimony that had the taxpayer sold its clay, it would have competed with the Kentucky-Tennessee miners. The controversy before us concerns the legal significance of those findings in light of our earlier decision, supra, and the applicable law.

### III

Section 611 of the I.R.C. of 1954,[5] 26 U.S.C. § 611 (1958) which corresponds generally to § 23(m) of the 1939 Code, permits as a deduction from taxable income a reasonable allowance for depletion of mineral assets in the case of mines, oil wells and other natural mineral deposits.

Section 614 of the 1954 Code, 26 U.S.C. § 614 (1958) provides that in the case of ball clay mines the allowance for depletion provided by section 611 shall be 15% of the "gross income from the property." Subsection c of section 613, 26 U.S.C. § 613(c) (1958) defines "gross income from the property" to be the "gross income from mining" where the taxpayer is engaged in mining operations. The section goes on to define mining to include "not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable product or products * * *" Section 613(c) (2), I.R.C. of 1954,[6] 26 U.S.C. § 613(c) (2) (1958 ed.)

Gross income is further defined in section 39.23(m)–1(e) (3) of Treasury

---

5. The pertinent statutory provisions read as follows:

"§ 611. Allowance of deduction for depletion.

(a) *General Rule.*—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. * * *

* * * * *

§ 613. Percentage depletion.

(a) *General Rule.*—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section.

(b) *Percentage Depletion Rates.*—The

mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

(3) 15 percent—ball clay, bentonite, china clay, sagger clay, metal mines (if paragraph (2) (B) does not apply), rock asphalt, and vermiculite.

* * * * *

(c) *Definition of Gross Income From Property.*—For purposes of this section—

(1) *Gross income from the property.* —The term 'gross income from the property' means, in the case of a property other than an oil or gas well, the gross income from mining.

(2) *Mining.*—The term 'mining' includes not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, * * *"

6. Congress subsequently amended this section to alleviate the problems encountered in defining the first "commercially marketable product." As the section now reads, the "gross income from mining" is determined on the basis of certain specified treatment, varying with the mineral involved, included by definition as part of the mining process. See P.L. 86–564, 74 Stat. 290, 26 U.S.C. § 613(c) (4) & (5) (1964).

Regulation 118.[7] That regulation provides that where the taxpayer processes the product other than by the ordinary treatment processes defined in the regulations, the gross income from mining means (1) "the representative market or field price (as of the date of sale) of a mineral product of like kind and grade as beneficiated by the ordinary treatment processes actually applied * * *" or (2) if "there is no such representative market or field price (as of the date of sale) * * * the representative market or field price of the first marketable product resulting from any process or processes * * * minus the cost and proportionate profits attributable to * * * the processes beyond the ordinary treatment process." The first of these means of calculating the gross income from mining is commonly referred to as the representative market or field price method, and the latter the proportionate profits method.

In United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960) the Supreme Court held that an integrated miner-manufacturer of vitrified sewer pipe must base its gross income from mining on the value of the raw fire clay and shale mined, after application of ordinary treatment processes usually applied by nonintegrated miners, and not on the value of its finished product. The Court, after a detailed study of the history of the depletion allowance, concluded that the purpose of the depletion allowance was to compensate the miner for the exhaustion of his mineral assets and not for the cost of recovery. Cannelton, 364 U.S. at 88, 80 S.Ct. 1581. Thus, the Court defined "commercially marketable product" to mean the product ready for industrial use or consumption, irrespective of whether the individual taxpayer could actually market that product at a profit. In so holding, the Court rejected the argument that by using the term "commercially marketable" Congress intended that the depletion allowance be based on a product which could be profitably marketed. See Bookwalter v. Centropolis Crusher Co., 272 F.2d 391 (8 Cir. 1959); C. I. R. v. Iowa Limestone Co., 269 F.2d 398 (8 Cir. 1959). The Court went further and noted that using the finished product in determining the depletion allowance of a miner-manufacturer gave these producers a marked advantage over both the non-integrated miner and the non-integrated manufacturer; such a result the Court concluded was contrary to Congressional intent. Thus, the gross income from mining was to be based on the product marketed or shipped by the ordinary miner, and the integrated miner-manufacturer was to be treated as if the operator were selling the mined mineral to himself for processing or production. 364 U.S. at 89, 80 S.Ct. 1581. As the majority notes, the market used in determining the first commercially marketable product is based on an industry wide standard.

The Court was again presented with the problem of defining the first commercially marketable product in Riddell v. Monolith Portland Cement Co., 371 U.S. 537, 83 S.Ct. 378, 9 L.Ed.2d 492 (1963). There the taxpayer was an integrated miner-manufacturer of portland cement. The Court of Appeals had held that since there was no market for the crushed limestone Cannelton did not apply. Thus, it upheld the taxpayers' contention that the finished cement, less certain non-mining costs, was the first commercially marketable product. Riddell v. Monolith Portland Cement Co., 301 F.2d 488, 489 (9 Cir. 1962). The Supreme Court reversed; relying on

7. While this case was pending in this court, new proposed regulations relating to these sections were issued. 21 F.R. 8439. These regulations define with specificity the manner in which gross income from mining shall be determined. As do the regulations applicable in this case, they provide for the same methods of determining gross income where the taxpayer does not sell his product near or at the mine. However, the manner in which the representative field price is evaluated is defined in great detail. See Prop.Treas.Reg. § 1.1613–3(c) (3)–(6), 21 F.R. 8439.

*Cannelton* it held that the gross income from mining "should be cut off at the point where the mineral first became suitable for industrial use or consumption." 371 U.S. at 538, 83 S.Ct. at 379. At that point, the depletion allowance would compensate for the depletion of the mineral asset.[8]

Subsequent decisions of the Courts of Appeals, following the teachings of these two cases, have consistently defined the first commercially marketable product of the individual taxpayers in a manner designed to limit the gross income from mining to the constructive income attributable to the first mined product suitable for industrial use. In seeking to insure that, within the Congressionally established scheme, the depletion allowance will compensate for the exhaustion of the mineral asset and will not allow the tax-free recoupment of the costs of recovering the mineral, the Courts have tied the first commercially marketable product closely to the mining operation. Thus, the gross income from mining is measured on the basis of the product suitable for industrial use or consumption. See, e. g., United States v. Light Aggregates, Inc., 343 F.2d 429 (8 Cir. 1965); United States v. Longhorn Portland Cement Co., 328 F.2d 491 (5 Cir. 1964); Virginia Greenstone Co. v. United States, 308 F.2d 669 (4 Cir. 1961); Standard Realization Co. v. United States, 289 F.2d 247 (7 Cir. 1961).

The taxpayer asserts that the foregoing principles control the disposition of this portion of the case and require the use of the representative market or field price method in determining gross income from mining. While it is true that the resolution of the issue before us

is controlled by the teachings of *Cannelton* and its progeny, they do not require the use of the representative market or field price method in every case and in all circumstances. The Supreme Court in *Cannelton* and in *Monolith Portland Cement* addressed itself to the definition of the first commercially marketable product and not to the method employed in determining the gross income from mining based on that product. Similarly, most of the cases relied on by the appellant deal with the problem of defining the taxpayer's first commercially marketable product, and not with the propriety of the method used in obtaining the gross income from mining.[9]

Since both parties agree that shredded ball clay was the first commercially marketable product; that issue is not before the Court. Rather, as indicated earlier, the issue presented by this appeal is which method of determining gross income from mining must the taxpayer use. Thus, as the majority notes, while we are guided by the teachings of *Cannelton*, the actual issue there decided does not fully resolve the problem here presented. United States v. Henderson Clay Products, 324 F.2d 7, 15 (5 Cir. 1963).

In the earlier *Henderson Clay Products* case, supra, the Court was presented with the same issue, but in a different factual setting. During the years 1951–54, the tax years there involved, the taxpayer was selling its brick for approximately $8.75 per ton. The Kentucky-Tennessee miners were receiving, at that time, $10.50 per ton for their shredded ball clay. Asserting that the Kentucky-Tennessee price was the representative market price, the taxpayer calculated its deple-

8. In a footnote, the Court observed that a market for crushed limestone did exist in the taxpayer's general area. 371 U.S. 537, 539 n. 2, 83 S.Ct. 378.

9. Indeed, both methods of calculating the gross income were employed in the cases cited by appellant, and some of the cases deal with the two methods only incidentally in connection with other issues presented. See Iowa Limestone Co. v. United States, 365 F.2d 63 (8 Cir. 1966);

Shamrock Oil & Gas Corp. v. C.I.R., 346 F.2d 377 (5 Cir. 1965); United States v. Light Aggregates, Inc., 343 F.2d 429 (8 Cir. 1965); Standard Lime & Cement Co. v. United States, 329 F.2d 939, 165 Ct. Cl. 180 (1964); United States v. Longhorn Portland Cement Co., 328 F.2d 491 (5 Cir. 1964); Hugoton Production Co. v. United States, 315 F.2d 868, 161 Ct.Cl. 274 (1963); United States v. Portland Cement Co., 315 F.2d 169 (10 Cir. 1963); United Salt Corp., 40 T.C. 359 (1963).

tion allowance on the basis of $10.50 per ton of ball clay.[10] The Commissioner disallowed the deduction and assessed deficiencies based on the proportionate profits method. This Court rejected the taxpayer's position and held that the Kentucky-Tennessee price was not representative as to the taxpayer because it failed to satisfy the principles established in *Cannelton*. The Kentucky-Tennessee price "in no way represent[ed] the price which a non-integrated brick manufacturer would pay for clay with which to make brick." 324 F.2d at 15. Therefore, the taxpayer was required to use the proportionate profits method as provided by the regulations.

The government contends that the rationale of that opinion has not been undermined by the slight decrease in the price of the clay and the slight increase in the price of the brick, but applies with undiminished vigor and requires an affirmance of the district court's judgment. It argues that here, as there, the Kentucky-Tennessee price reflects expenses not incurred by the taxpayer, such as the research, advertising, and promotional expenses necessary for the sale of shredded ball clay. It also asserts that the price is not one which a non-integrated manufacturer would pay for clay to be manufactured into brick and sold at the price the taxpayer sold its brick. By its own admission, the taxpayer could have only broken even at the $10.00 per ton figure. Thus, the government concludes, the Kentucky-Tennessee price was not representative; it is not the price which the taxpayer could realistically charge to itself for the raw product, and it does not reflect the exhaustion of the mineral estate alone but includes impermissible and unexpended costs. Since the price is not representative, the taxpayer must use the proportionate profits

method for determining its gross income from mining. The majority position, while substantially similar to the governments, does not exactly follow the same reasoning, and its reliance on the earlier opinion is considerably less. I will discuss what I consider to be the inadequacies of the majority's analysis as I reach the relevant issues.

The government's analysis is defective in that it takes the rationale of our earlier opinion out of the context of the facts with which it dealt and transports it to a different factual setting. The basis of the earlier decision was that the hypothetical gross income determined for purposes of the depletion allowance was greater than the taxpayer's actual gross income. Early in that opinion this Court stated:

"The chief difficulty arises from the fact that although the first commercially marketable product of non-integrated clay miners is shredded ball clay having a market price of $10.50 a ton, the taxpayer sold its finished brick for only $8.75 a ton." 324 F.2d 7.

And again the Court noted:

"Tax law is law unto itself. There are no equities in tax law. And there is an area of permissible illogic in tax law. But when a taxpayer claims depletion on a fictitious gross income greatly in excess of its actual gross income, we find the claim highly indigestible." 324 F.2d at 12.

The entire rationale of that opinion must be read in that context.

The taxpayer sought to explain the anomalous prices by assigning the higher cost of the clay to the advertising, promotion, and research expenses incurred by the Kentucky-Tennessee miners, and the Court accepted the explanation.[11]

---

10. These figures do not accurately picture the price variation as the $8.75 figure is per ton of finished brick and not per ton of clay in the finished brick. However, the hypothetical gross income from mining calculated on the basis of the clay tonnage contained in the finished brick sold was greater than the actual gross

income received from the sale of the brick. 324 F.2d 7, 9 n. 1.

11. The majority assumes that the same factors exist in the instant case. I find this difficult to accept in view of a record which rebuts *every* factual assumption upon which our former opinion was based.

But because these cost factors caused the Kentucky-Tennessee price to exceed the price obtained for the finished brick, they deprived that price of its representative quality. For a market price to be representative, under the teachings of *Cannelton* and as held by our prior opinion, the taxpayer's hypothetical or constructive gross income from mining obtained on the basis of that price must represent the income which the taxpayer would have received had he sold his product instead of processing it further. This requirement is manifestly not satisfied when the constructive gross income exceeds the taxpayer's actual gross income. Therefore, this Court concluded, the Kentucky-Tennessee price was not representative as to the taxpayer under the peculiar facts and circumstances then presented. The Court also noted that the record did not indicate that the taxpayer would have received the Kentucky-Tennessee price, nor that it would have competed with the miners had it sold the clay. Thus, there was some question whether the market from which the price was secured was comparative or was the one in which the taxpayer would have competed.

The process of restricting the depletion allowance so that it only compensates for the exhaustion of the mineral resources is at best an approximate one—both by the practicalities of the situation and the statutory scheme devised to allow for percentage depletions. It is, however, the guiding principle in ascertaining the first commercially marketable product, and determining whether a price obtained by a nonintegrated miner is a representative one insofar as an integrated miner is concerned. But in making that latter determination, it is also necessary to look to the method which Congress has created in permitting percentage depletion allowances. That scheme is to base the depletion allowance on the gross income attributable to the first commercially marketable product. This scheme envisions an even-handed treatment of both the integrated miner-manufacturer and the non-integrated miner. United

States v. Cannelton Sewer Pipe Co., supra; Food Mach. & Chem. Corp. v. United States, 348 F.2d 921 (Ct.Cl.1965). To accomplish that result it is necessary for the integrated miner-manufacturer to approximate its gross income from the mining processes alone. The regulations provide two methods for reaching that hypothetical figure: the representative market or field price and the proportionate profits method. Assumedly because it more accurately predicts the price obtainable by the integrated producer, and thus comports with the general statutory scheme as indicated in *Cannelton,* the representative or field price method is the preferred means of determining the gross income, and the proportionate profits method is to be used only if no representative price can be ascertained. Treas.Reg. 118 § 39.23(m)–1(3) (1939 Code); see Alabama By-Products Corp. v. Patterson, 258 F.2d 892 (5 Cir. 1958). But to the extent that the non-integrated miner incurs costs not incurred by the integrated miner, use of the representative market or field price, which is based on the prices charged by the non-integrated miner, results in a hypothetical gross income for the integrated miner that includes costs not actually incurred. It is only when these costs, not incurred by the integrated miner-manufacturer, affect the hypothetical gross income in such a way as to cause the depletion allowance to deviate from the exhaustion of the mineral estate anticipated by the statutory scheme that the prices charged by the non-integrated miners lost their representative capacity. Such a situation clearly existed under the facts of the earlier *Henderson Clay Products* case.

To argue, as the majority apparently does, that the taxpayer may not base its depletion on a field or market price established by the evidence, and found by the district court to be the price it would have received had it sold its first commercially marketable mineral product because that price comprehends expense of research and promotion not expended by the taxpayer would virtually deprive all integrated miner-manufacturers of the

right to use the price obtained by the non-integrated miner. Under the analysis urged by the majority, an integrated miner-manufacturer would have to demonstrate that it incurred similar research and advertising costs, and that it had similar research facilities for it to be able to use the market price established by the non-integrated miner if it is to use the representative market price method of determining its gross income from mining. As a direct result of being integrated and using most, if not all, of its mined products, the integrated miner-manufacturer does not have sales or promotion costs attributable to the first commercially marketable mineral product and frequently will not have the same research facilities,[12] or incur the same costs as the non-integrated producer. One of the theories of the *Cannelton* decision is that the integrated miner-manufacturer is deemed to be selling to himself; surely under that theory the integrated miner-manufacturer does not have any expenses related to advertising or selling its mineral product. Thus, if the representative market or field price method of determining the gross income from mining is to be a viable concept in this area, the definition of what constitutes a representative price can not be limited in the manner suggested by the majority.

Further, to hold that the Kentucky-Tennessee price is not representative because it includes costs other than those attributable to "the ordinary treatment processes actually applied," as the majority does, not only distorts the plain meaning of the language of the regulation, but also destroys the parity between the integrated miner-manufacturer and the non-integrated miner, which *Cannelton* decreed. Since the regulations provide that for the non-integrated miner "gross income from the property means the amount for which [the crude mineral] product was sold," Treas.Reg. 118, § 39.23(m)–1(e) (3), and since it is manifest that the price for which the product was sold includes the costs of advertising, research, general overhead costs, as well as a profit margin, the price secured by the non-integrated miner can never be used by the integrated miner-manufacturer because it includes costs other than those attributable to the "ordinary treatment processes actually applied." Such a result not only flies in the face of heretofore accepted decisions, but effectively destroys the representative price method of determining gross income from mining. Such a theory is illogical and unacceptable.

IV

Since the representative price is tied to the price which the integrated miner would receive had he sold the product, the price received by the non-integrated miner which is sought to be used as the representative price must be that of those non-integrated miners with whom the integrated miner would compete. Shamrock Oil & Gas Corp. v. C. I. R., 346 F.2d 377 (5 Cir. 1965); cf. Alabama By-Products Corp. v. Patterson, supra. As

12. The testimony adduced at trial showed that Henderson had the same research facilities for presale mining operations as did the Kentucky-Tennessee miners. However, the Kentucky-Tennessee miners engaged in research activities directed at demonstrating the utility of the clay for various purposes in order to secure a wider class of prospective customers or to meet market demands. The government argued in the trial court and in its brief that Henderson's lack of such facilities is evidence of the non-representative nature of the Kentucky-Tennessee price. Since these expenditures and facilities are directed at obtaining a market for the non-integrated miners product, they are naturally not needed or incurred by the integrated miner-manufacturer. Thus, the extent to which Henderson's research facilities did not match those possessed by the Kentucky-Tennessee miners can not be evidence of the non-representative nature of the Kentucky-Tennessee price if the integrated miner-manufacturer is to be able to use the representative market price method of determining its gross income from mining. In essence the facilities owned and the costs incurred by the Kentucky-Tennessee miners which were not owned or incurred by Henderson are costs attributable to the sales of clay, a cost never incurred by the integrated miner-manufacturer.

this Court observed in the earlier case, "when the Supreme Court eschewed a method of computing a depletion basis which discriminated against the ordinary miner, it had in mind, primarily, a situation in which the integrated and non-integrated miner were in competition with each other." 324 F.2d at 13. Thus, the price must be one obtainable in the market in which the integrated miner would compete had it sold its mineral products, Shamrock Oil & Gas Corp. v. United States, supra; Hugoton Prod. Co. v. United States, 315 F.2d 868, 161 Ct.Cl. 274 (1963), and must represent the price which would be received for the product actually sold, Ames v. United States, 330 F.2d 770 (9 Cir. 1964); Gray Knox Marble Co. v. United States, 257 F.Supp. 632 (E.D.Tenn.1966); North Carolina Granite Corp., 43 T.C. 149 (1964), or the first commercially marketable product had it been sold. Cf., Iowa Limestone Co. v. United States, 365 F.2d 63 (8 Cir. 1966); Dravo Corp. v. United States, 348 F.2d 542 (Ct.Cl.1965). Further, the price must reflect the actual state of the market in which the taxpayer would compete. Hugoton Prod. Co. v. United States, supra; Alabama By-Products Co. v. Patterson, supra. What is sought, is the price the integrated miner-manufacturer would have received, in the market in which he would have entered, at the time he would have sold his product, had he not processed it further. Cf. Hugoton Prod. Co. v. United States, 315 F.2d 868, 875 (Ct.Cl.1963). The inquiry is a factual one. Ames v. United States, 330 F.2d 770, 773 (9 Cir. 1964).

Contrary to the position taken by the majority, the necessity for the appellant to produce air-floated clay to successfully compete with the Kentucky-Tennessee miners in the ball clay market has no relevancy to the issue whether the Kentucky-Tennessee price was representative. In the first place, the relevant market for determining a representative field or market price was not the ball clay market, but the shredded ball clay market. Indeed, since *air-floated clay is a further refined product* and not the first

commercially marketable product, even the Kentucky-Tennessee miners are required to base their gross income from mining for the purpose of determining their depletion allowance on the total tonnage of shredded ball clay sold, whether sold as shredded ball clay or as air-floated clay. Thus, in determining the market price on which to base the gross income from mining, the shredded ball clay price is to be used, irrespective of whether either the appellant or the Kentucky-Tennessee miners had to produce air-floated clay to meet the demands of prospective purchasers. It therefore seems anomalous to hold that the shredded ball clay price is not the true representative price because those who determine that price also engage in the sale of air-floated clay.

Secondly, it is not necessary for the taxpayer to be able to compete successfully in a market for that market price to be representative as to him. Alabama By-Products Corp. v. Patterson, supra; cf. United States v. Cannelton Sewer Pipe Co., supra. It is sufficient if the price is the one it would have obtained had it sold its mineral product and it permits the income attributable to the mining process to be estimated. In Alabama By-Products Corp. v. Patterson, supra, we held, against the protestations of the taxpayer, that the sale and purchase of coking coal, the mineral product in question, was sufficient to establish a representative market price, even though the evidence demonstrated that the taxpayer was a "forced" competitor and that it was selling the coal at a loss. Further, since *Cannelton* established that in determining the first commercially marketable product the relevant market was that of the industry as a whole, irrespective of the taxpayer's ability to profitably or successfully compete in that market, the majority opinion creates two separate and distinct market concepts to be used in applying one section of a statute. One market concept, that engendered by *Cannelton*, is to be used when construing the statute, i. e. in determining the first commercially marketable mineral product, and the other when con-

struing the regulation designed to interpret that statute, i. e. in determining whether a market price is representative. Such a proliferation of conflicting theories in effectuating a single statute is neither desirable nor, in this case, necessary.

The district court found that the taxpayer's shredded ball clay was of like kind and quality as that mined by the Kentucky-Tennessee miners, and that had it decided to sell the clay there was a substantial market for it in Texas and the United States.[13] It also found that had the taxpayer sold its clay it would have received $10.00 a ton for it. The majority concludes that because the taxpayer was not equipped to sell air-floated clay, "there is, therefore, no basis for the finding by the trial court that the market price in Texas for shredded ball clay was the same $10.00 realized in Kentucky and Tennessee." This is tantamount to holding the district court's finding was clearly erroneous. In light of the stipulations and the evidence,[14] it is inconceivable to

13. The Court found as follows:
"During the 1950's there was a market for shredded ball clay and air floated ball clay all over the United States, including Texas and the Southwest, and the average market price or value of shredded ball clay during such years and in 1955 was $10.00 per ton. The price of $10.00 per ton was the typical prevailing market price for average shredded ball clay at the mine operator's plant, which the Kentucky-Tennessee miners received in such years for the shredded ball clay that they sold.
"During the fiscal year 1955 there was a market for the shredded ball clay that Plaintiff produced and had Plaintiff chosen to sell its ball clay in the shredded form during that year it would have received an average of $10.00 per ton for said shredded ball clay."

14. The parties stipulated that:
"In 1955, such Kentucky-Tennessee miners sold in excess of 400,000 tons of shredded and air floated ball clay all over the United States, including Texas and the Southwest. During the 1950's there was a market for shredded ball clay and air floated ball clay all over the United States, including Texas and the Southwest, and the average market price or value of shredded ball clay during such years and in 1955 was $10.-00 per ton. $10.00 per ton was the typical prevailing market price for average shredded ball clay, at the mine operator's plant, which such Kentucky-Tennessee miners received in such years from their sales of shredded ball clay."
"Such shredded ball clay was the first commercially marketable mineral product of plaintiff's ball clay operations. At that point, plaintiff's ball clay first became suitable for industrial use or consumption, and if plaintiff had chosen to sell ball clay in the shredded form, a market for such shredded ball clay in Texas and the United States existed."

In addition to the stipulation, the district court's findings were supported by the evidence adduced at trial. Thus, Dr. Robert L. Stone, Henderson's expert witness on the ball clay industry testified as follows:
"Q. (by Mr. Bird) If Henderson Clay Products had elected to sell its clay as shredded ball clay what price would it have received for such shredded ball clay?
*       *       *       *       *
"What would have been the price per ton if they had sold this clay instead of ball clay [brick]?
"A. Same as the other, ten dollars a ton—average.
"Q. Now, if Henderson had sold their shredded ball clay, would it have been commercially competitive to and with the Tennessee-Kentucky ball clay people and other miners of ball clay?
"A. Yes, it would have been competitive."
The testimony of Mr. Bryce, President of Henderson Clay Products, further corroborated the finding of the Court.
"Q. (Mr. Bird) Mr. Bryce, you heard what I read to Doctor Stone about the stipulation having to do with the fact that plaintiff's ball clay first became suitable for industrial use or consumption, at the shredded ball point, and that if you had chosen to sell ball clay in the shredded form a market for such clay existed in Texas and in the United States.
"My question is this: If you had chosen to sell your ball clay in the shredded form, what, in your opinion would you have received for such clay per ton?
*       *       *       *       *
"What price per ton would you have received for shredded ball clay?
"A. Average—ten dollars.
"Q. Now, if you had chosen to sell your ball clay—or your ball clay as shredded ball clay—would you have been in commercial competition with the Kentucky-Tennessee miners of ball clay?
"A. Yes, sir."

me that such a conclusion can be reached. The parties stipulated that there was a market for shredded ball clay in the United States, including Texas, and that the average price for shredded ball clay during 1955 was $10.00 per ton. From those uncontested and found facts it logically follows that the appellant would have received $10.00 a ton for its shredded ball clay.

If the majority, by using the phrase, 'the same $10.00 realized in Kentucky and Tennessee," means that because the taxpayer did not sell air-floated clay it would not receive $10.00 a ton for its shredded ball clay, it is reaching a conclusion completely unsupported by any evidence. Admittedly such a situation could exist, but the record before us does not contain the slightest indication that such a situation existed. The most that can be inferred from the record is that Henderson could not successfully compete against the non-integrated miners of ball clay. As I have shown earlier, such a restrictive construction of the market from which a representative price may be drawn is neither required nor called for by the statute or the regulations.

In light of the district court's findings, which I believe are manifestly supported by the record, and in view of the uncontradicted testimony that the taxpayer would have competed, in the sense relevant here, with the Kentucky-Tennessee miners had it marketed its clay, I can only conclude that the Kentucky-Tennessee price is the price which the taxpayer would have received in the competitive market in which the Kentucky-Tennessee miners deal. To the degree that the representative market or field price must reflect such competition, the $10.00 per ton price meets that requirement.[15] Further, that price does not cause such a distortion of the hypothetical gross income from mining as to require the use of the proportionate profits method of determining gross income. Although the majority finds it evident that had Henderson paid itself $10.00 a ton for the shredded ball clay, its costs would exceed the $12.38 average sales price for the finished brick, the record demonstrates that for 1955 the taxpayer would have about broken even. Further, the transportation costs from the Kentucky-Tennessee field to the taxpayers plant, used by the majority in reaching that conclusion, are not relevant cost factors in ascertaining whether the market price asserted to be representative is the price at which the taxpayer would have sold the clay to itself because the simple fact is that the taxpayer had no such costs: it used its own clay, mined at its own mines, and processed its mined product into shredded ball clay at its own facilities.[16] Thus, no transportation costs were incurred. On the basis of the record before us, it can not be said that the field or market price asserted by the taxpayer as the representative field or market price plus the costs of the non-mining process employed by Henderson exceed the actual sales price of the finished brick sold.[17]

15. I can not agree with the majority that the price must "be a competitive price, so far as Henderson was concerned." Rather, as indicated earlier, I believe that a competitive market is required only in the sense that the taxpayer can enter that market as a seller, and not that he must be a successful competitor.

16. Further, since the market price was f.o.b the plant, the $10.00 a ton includes no transportation costs.

17. Indeed, I have serious doubts whether such a rule may validly be applied in all cases as a test of the representative nature of the market price sought to be used in determining the gross income from mining. To limit the representative market price in the manner suggested by the majority requires the integrated miner-manufacturer to price his finished product in such a manner as to break even, at least, in its manufacturing process if he desires the same depletion allowance as that permitted the non-integrated miner. Thus, if for competitive market reasons generated by the market for its finished product, the taxpayer chooses to take a loss on the manufacturing phase of its business, it is thereafter relegated to the proportionate profits method of determining his gross income from mining, even though parity

Accordingly, it is clear that the representative market or field price method of determining the gross income from mining for purposes of the depletion allowance should be permitted under the facts and in the circumstances of this case.

### V

Turning to the question of whether the taxpayer is entitled to use the method of determining its depletion allowance for brick and tile clay as provided by P.L. 87–312, 75 Stat. 674 (1960), I can not agree with the majority's rejection of the taxpayer's position in view of the severe restriction placed by the regulation on the taxpayer's right to utilize a statute Congress manifestly intended to be for the benefit of the class of taxpayer's to which the appellant belongs.

For the purposes of § 613(c) Public Law 87–312 defines the gross income from the property of a miner of brick and tile clay who uses the clay in the manufacture of brick as 50 percent of the amount for which the brick is sold, but not to exceed $12.50 multiplied by the number of short tons used in the brick sold. The statute also requires the taxpayer to make an election under the statute if it wishes to use the statutory provisions. The statute further provides that an election shall be effective for all the taxable years beginning before January 1, 1961, which meet certain requirements set forth in the statute.[18] The election "shall be made in such form and manner as the Secretary of the Treasury or his delegate shall prescribe by regulations." P.L. 87–312(c), 75 Stat. 674. Pursuant to the statute, the Secretary is-

---

with the non-integrated miner, and the statutory purpose that depletion is to compensate for the exhaustion of the mineral estate are better served by the use of the representative market or field price method.

18. The pertinent portions of the statute are as follows:

"That (a) *Election for past years.*—In the case of brick and tile clay, fire clay, or shale used by the mineowner or operator in the manufacture of building or paving brick, drainage and roofing tile, sewer pipe, flower pots, and kindred products (without regard to the applicable rate of percentage depletion), if an election is made under subsection (c), for the purpose of applying section 613(c) of the Internal Revenue Code of 1954 (and corresponding provision of the Internal Revenue Code of 1939) for each of the taxable years with respect to which the election is effective—

(1) Gross income from the property shall be 50 per centum of the amount for which the manufactured products are sold during the taxable year except that with respect to such manufactured products, gross income from the property shall not exceed an amount equal to $12.50 multiplied by the number of short tons used in the manufactured products sold during the taxable year, and

(2) For purposes of computing the 50 per centum limitation under section 613 (a) of the Internal Revenue Code of 1954 (or the corresponding provision of the

Internal Revenue Code of 1939), the taxable income from the property (computed without allowance for depletion) shall be 50 per centum of the taxable income from the manufactured products sold during the taxable year (computed without allowance for depletion).

(b) *Years to which applicable.*—An election made under subsection (c) to have the provisions of this section apply shall be effective for all taxable years beginning before January 1, 1961, in respect of which—

(1) The assessment of a deficiency,

(2) The refund or credit of an overpayment, or

(3) The commencement of a suit for recovery of a refund under section 7405 of the Internal Revenue Code of 1954, is not prevented on the date of the enactment of this Act by the operation of any law or rule of law. Such election shall also be effective for any taxable year beginning before January 1, 1961, in respect of which an assessment of a deficiency has been made but not collected on or before the date of the enactment of this Act.

(c) *Time and Manner of electing.*—An election to have the provisions of this section apply shall be made by the taxpayer on or before the sixtieth day after the date of publication in the Federal Register of final regulations issued under authority of subsection (f), and shall be made in such form and manner as the Secretary of the Treasury or his delegate shall prescribe by regulations. Such election, if made, may not be revoked."

sued regulations which provided that "[t]he election shall be made on or before December 11, 1961, by filing a statement with the district director with whom the taxpayer's income tax return for the taxable year in which the election is made is required to be filed. The statement shall include the following: (1) A clear indication that an election is being made under the Act, and (2) the taxable years to which the election applies. Amended income tax returns reflecting any increase or decrease in tax attributable to the election shall be filed for the taxable years to which the election applies. * * * [A]mended returns shall be filed * * * [no] later than March 31, 1962, unless an extension of time is granted under section 6081 of the Internal Revenue Code of 1954." Treas.Reg. 118, § 1.9005–4(b).

The district court found that on December 7, 1961, the taxpayer filed a timely election to utilize the provisions of P.L. 87–312 with respect to the years 1955 through 1961. It also found that on December 19, 1961, the taxpayer timely filed its return for the fiscal year ending March 31, 1961. On March 14, 1962, the taxpayer requested, by letter, an extension of time until May 31, 1962, within which to file its amended returns as to certain years including 1955. The I.R.S. on April 9, 1962, advised the taxpayer, by letter, that such an extension of time would not be granted. No amended return was or has been filed for 1955.

Except for the failure to file an amended return, both parties agree that the taxpayer met all of the conditions necessary to utilize the provisions of P.L. 87–312 with respect to 1955 through 1961. The government argues, the district court held, and the majority concludes that the taxpayer failed to elect under the statute because of its failure to file the amended returns for the years 1955 through 1961. The taxpayer contends that to the extent the regulation requires the filing of an amended return, it is in conflict with the statute and invalid. Thus, we are faced with the question of whether an amended return for

every year to which the statute applies can, by regulation, be validly made a requirement of an election under the statute in question.

It is well established that Treasury Regulations will not be disturbed except for cogent reasons and unless arbitrary and unreasonable or contrary to the statute they are designed to interpret or enforce. Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes * * * they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons." C. I. R. v. South Tex. Lumber Co., 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831, 836 (1948). Where Congress has expressly delegated to the Secretary the function of promulgating administrative regulations, greater weight will be given to such regulations than accorded interpretative regulations. 1 Mertens, Federal Income Taxation § 3.20, pp. 35, 36–37 (1962); cf. Jaubert Bros. v. United States, 141 F.2d 206 (5 Cir. 1944). However, where such regulations exceed the authority conferred or are plainly inconsistent with the enabling statute, the regulations will not be enforced. Mitchell v. C. I. R., 300 F.2d 533 (4 Cir. 1962); Granquist v. Hackleman, 264 F.2d 9 (9 Cir. 1949); cf. C. I. R. v. Acker, 361 U.S. 87, 80 S.Ct. 144, 4 L.Ed.2d 127 (1959); Willett v. C. I. R., 365 F.2d 760 (5 Cir. 1966). Similarly, such regulations are invalid when they are contrary to the intendment of the statute, or when they limit the effect of the statute to the detriment of the taxpayer. Smith v. C. I. R., 332 F.2d 671 (9 Cir. 1964); Scofield v. Lewis, 251 F.2d 128, 129 (5 Cir. 1952); Miller v. C. I. R., 237 F.2d 830 (5 Cir. 1956).

P.L. 87–312 was enacted by Congress in 1960 to ameloriate the hardships and inequities caused by the retroactive application of the principles established in United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960). Prior to that decision, the Internal Revenue Service had permitted

368

integrated miner-manufacturers of brick and vitrified products to base their depletion allowance on the finished product in accord with the rationale of United States v. Cherokee Brick & Tile Co., 218 F.2d 424 (5 Cir. 1955) and United States v. Merry Bros. Brick & Tile Co., 242 F.2d 708 (5 Cir. 1937). See Technical Inf. Rel. No. 62 (1957). After the decision in *Cannelton,* the I.R.S. announced that the principles laid down by the Supreme Court would be applied to all cases then open. Congress, after reviewing this history, concluded "that taxpayers in the brick and tile industry were justified * * * in basing percentage depletion on the value of the end product." S.Rep. No.903, 87th Cong., 1st Sess. U.S.Code Admin. & Cong.News, p. 3011 (1961). The Senate Committee report stated: "The House was convinced that taxpayers are justified in placing full faith and credit on the long line of court cases upholding percentage depletion on the finished product in the case of brick and tile clay, on the official statement issued by the Internal Revenue Service that it intended to follow the principles laid down in those court cases, and on the fact that the Internal Revenue Service had settled many cases on this basis." S.Rep.No.903, 87th Cong., 1st Sess., U.S.Code, Cong. & Admin.News, p. 3011 (1961).[19] Thus, it is clear that we are dealing with a remedial statute; a statute enacted to grant relief to those whom Congress felt were justified in relying on the previous law and the prior position of the I.R.S. Therefore, the statute should be construed liberally.

Further, since Congress was fearful of the economic impact of the *Cannelton* decision on this industry, access to the stat- ute should not be unduly hampered if the Congressional purpose is to be effectuated.

As the government construes the regulation, it requires the taxpayer to notify the district director of his intention to utilize the provisions of P.L. 87–312 and to file an amended return for every tax year to which the provisions are or could be applicable. Failure to file an amended return as to any one year to which the statute applied, or might apply, negates the election and deprives the taxpayer of the method of determining gross income from the property as provided by this remedial statute for any tax year to which it might apply. The regulation does not merely "require the filing of an amended return for each of the years for which the election was sought to be applied," but rather it requires the filing of an amended return for every year in which the taxpayer could use the provisions of the statute.

The necessity of preparing an amended return for all the years to which the statute applied or might apply, in this case five years, is an onerous burden. Further, since the taxpayer is subject, under the regulation, to the risk of losing all the benefits afforded by the statute if it fails to file an amended return for any one year to which he was entitled to use the statutory provisions, this burden and the risks incident to it constitute a substantial bar to those seeking to utilize the statute's provisions. The burden is clearly greater than contemplated by Congress in authorizing the Secretary to prescribe the manner and form in which an election was to be made. It substantially limits the statute's applicability and frustrates the purpose of granting

19. The Committee report also noted that: "The Houes committee report also suggests that to apply the Treasury Department's interpretation of the *Cannelton* case to past, open years of taxpayers who are miners of clay and shale would be highly inequitable because of the very large number of cases which the Treasury Department had in the past already settled upon the principles of the *Cherokee* and *Merry*

*Brothers* cases." U.S.Code, Cong. & Admin.News, p. 3011 (1961)
It was further observed:
"To retroactively impose a tax in these cases would in the view of the House be especially serious in the brick and tile industry because it is traditionally an industry of many small, independent businesses which do not have large financial resources to fall back on if there is to be a redetermination of their tax liability." Id. at 3012.

relief from the decision in *Cannelton* to those otherwise eligible. Therefore, to the extent the regulation requires the filing of amended income tax returns, it goes beyond the authority conferred by the statute and is invalid. Scofield v. Lewis, supra; Willett v. C. I. R., supra. Since the taxpayer filed a timely election to use the provisions of P.L. 87–312, it should be permitted to base its depletion allowance in accordance with that statute.

I respectfully dissent.