**UNITED STATES of America,**
**Appellant,**

v.

**LONGHORN PORTLAND CEMENT**
**COMPANY, Appellee.**

**No. 19910.**

United States Court of Appeals
Fifth Circuit.

March 2, 1964.

Rehearing Denied April 8, 1964.

492

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Tax Div., Dept. of Justice, Washington, D. C., Ernest Morgan, U. S. Atty., William O. Murray, Asst. U. S. Atty., San Antonio, Tex., Melva M. Graney, Atty., Tax Div., Dept. of Justice, Washington, D. C., for appellant.

Rupert N. Gresham, Reagan Houston, III, San Antonio, Tex., for appellee.

Before RIVES and GEWIN, Circuit Judges, and SHEEHY, District Judge.

SHEEHY, District Judge.

This, an income tax refund case, presents the problem of determining the "statutory percentage mining depletion allowance" for a taxpayer who mines a mineral which it owns and processes into a product which it sells. The years involved are 1951, 1952 and 1953.

During all times pertinent hereto Appellee, hereinafter referred to as Longhorn, was engaged in mining limestone, of a type or variety called cement rock, from its quarry adjacent to San Antonio, Texas, and using it to make portland cement at its cement plant located at the quarry site. Such cement rock has an average calcium carbonate content of 78.4 percent and is, therefore, classified as a "calcium carbonate" under the provisions of Sec. 114(b) (4) (A) (ii) of the Internal Revenue Code of 1939. For each of the tax years in question the Commissioner allowed Longhorn depletion allowances computed by the proportionate profits method prescribed in Sec. 39.23(m)–1(e) (3) of Treasury Regulations 118 on the assumption that "mining" included the processes applied by Longhorn up to the kiln process.[1] The deficiencies arising because of the method used by the Commissioner in determining Longhorn's depletion allowances were paid by Longhorn who then timely filed appropriate claims for refund in which it claimed that its depletion base, i. e., "gross income from mining," was the sales price of its finished cement, reduced by the proper percentage attributable to the cost of the gypsum added in making the cement, the cost of bags and bagging and the amount of freight from Longhorn's plant to its customers. Those claims having been disallowed, Longhorn instituted this action. The district court upheld Longhorn's claim to depletion on finished cement and entered a judgment allowing Longhorn a tax refund in excess of $550,000.00.

Sec. 23(m) of the Internal Revenue Code of 1939 established a deduction of a "reasonable allowance for depletion" of mineral resources, such allowance "to be made under rules and regulations to be prescribed by the Commissioner." Sec. 114(b) (4) (A) (ii) of the same Code provides for a depletion allowance for calcium carbonates of ten percent of "the gross income from the property," such allowance not to exceed 50 percent of the net income of the taxpayer from the property. Subsection (b) (4) (B) of that section defines "gross income from

---

1. The Commissioner's allowance of the processes up to the kiln process was apparently done because of Rev.Rul. 290, 1953–2 Cum.Bull. 41, which stated that, as to calcium carbonates and shales mined for use in the cement industry, crushing, grinding and blending which occurred before or during the grinding were considered "ordinary treatment processes." That action of the Commissioner was prior to the decision of the Supreme Court in United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581.

the property" as "gross income from mining" and defines "mining" as including "not merely the extraction" of the mineral from the ground but also "the ordinary treatment processes normally applied by mine owners or operators in order to obtain the *commercially marketable mineral product * * *.*" (Emphasis supplied.) Thus Longhorn is entitled to a depletion allowance of ten percent of its gross income from mining its cement rock with such allowance not to exceed 50 percent of its net income from its property. Its "gross income from mining" depends upon a determination as to the stage at which its cement rock first became a "commercially marketable mineral product."

The district court found and concluded that finished portland cement was the first and only commercially marketable mineral product that Longhorn did or could obtain from its quarry and, based on that finding and conclusion, determined that Longhorn was entitled to a depletion allowance on the basis of the sales price of its finished cement less the proper percentage attributable to the cost of gypsum added in making the cement, the cost of bags and bagging and the amount of freight from Longhorn's plant to its customers.

Appellant contends that this case is controlled by United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581, and Riddell v. Monolith Portland Cement Co., 371 U.S. 537, 83 S.Ct. 378, 9 L.Ed.2d 492,[2] and that the conclusion and determination of the district court above mentioned is contrary to the holdings in those cases. Longhorn, on the other hand, contends that Cannelton and Monolith are not applicable under the facts in this case and assert that the district court was correct in determining that the first commercially marketable mineral product was finished portland cement and, in the alternative, contends that in the event it is not entitled to use as its depletion base the selling price of its cement, then

its base for determining its depletion allowance should be determined by the selling price of its finished cement, minus the cost and proportional profits attributable to its processes that are employed after obtaining the clinker. We agree with Appellant.

The material and controlling facts are undisputed. Although the district court filed detailed Findings of Fact and Conclusions of Law, it would serve no useful purpose to here set out said findings and conclusions because many of the purported Findings of Fact are in the nature of Conclusions of Law rather than Findings of Fact, some are immaterial and some have no support in the evidence. The material and controlling facts, in addition to those hereinabove set forth, are as hereinafter stated.

Limestone is a rock containing 50 percent or more calcium carbonate. While limestone is the principal "raw material" used in cement production, it is used for many other purposes. It is used for road material, ballast and concrete aggregate, agricultural limestone and various chemical and metallurgical purposes. It is classified broadly into two groups according to the calcium carbonate content, i. e., high calcium limestone which is usually referred to as chemical and metallurgical limestone and low calcium limestone sometimes referred to as ordinary limestone. The number of uses for the higher grade are greater than for the lower grade. The manufacturer of cement requires silica, alumina and iron oxide in addition to the calcium carbonate contained in the limestone. These additional ingredients are found in varying degrees in ordinary limestone as distinguished from high calcium limestone and also are found usually in clay. Thus if a high calcium limestone is used in manufacturing cement, the calcium carbonate content must be reduced by mixing the limestone with a lower grade limestone or by adding clay or shale.

Limestone of the cement rock variety, such as is Longhorn's limestone, is an

2. The Monolith case was decided subsequent to the perfection of the appeal in this case.

argillaceous limestone, i. e., rich in clay content, which is not suitable or useful for any other commercial purpose except to process into cement. Cement rock is most desirable for cement manufacturing not only because it contains the required ingredients in addition to calcium carbonate but because it is softer than higher grade limestone and, therefore, requires less crushing and grinding. Large amounts of limestone, other than limestone of the cement rock variety, are sold in crushed form annually in the United States for various purposes, including the manufacture of cement. Approximately 80 percent of the cement in this country is made from relatively pure limestone to which clay and shale are added. Approximately 16 percent of the cement is made from limestone of the cement rock variety which is found primarily in the Lehigh Valley. While Longhorn has never sold any of its cement rock to any other person and there never have been any sales by one person to another of cement rock in crushed form or in any other form other than in the form of finished cement, the record shows that the only persons engaged in the mining of cement rock in the United States are persons engaged in the manufacture of cement and who process into cement all of the cement rock they mine.

As above stated, Longhorn's cement rock has an average calcium carbonate content of 78.4 percent. It is perfect for use in the manufacture of cement not only because of its calcium carbonate content but because it is soft and thus crushes and grinds easily and virtually has all the ingredients necessary for cement. It is not suitable or useful for any commercial purpose except to process into portland cement. It is too low in calcium carbonate content to qualify for use in agricultural limestone, and it is too soft to qualify for other uses for which limestone is normally used such as road material, ballast and concrete aggregate.

In order to manufacture its cement rock into cement Longhorn follows the following processes: (a) the cement rock is extracted from the quarry; (b) it is then crushed; (c) then ground and mixed with water to produce a slurry; (d) the slurry is then sintered in kilns producing what is commonly known as clinker or cement clinker; (e) the clinker is then ground into fine cement to which is added a small per cent of gypsum; and (f) the cement is then stored and thereafter loaded and shipped to customers. In extracting the cement rock from the quarry Longhorn, unquestionably, is performing mining operations. In applying the processes, at least those subsequent to the crushing of the cement rock, that it applies in making its cement, Longhorn is engaged in manufacturing.[3] Therefore, notwithstanding the finding or conclusion of the District Court to the contrary, Longhorn is an integrated miner-manufacturer. See Riddell v. Monolith Portland Cement Co., supra, and United States v. Portland Cement Company of Utah, 10 Cir., 315 F.2d 169.

In United States v. Cannelton Sewer Pipe Co., supra, the Court had before it the troublesome question of determining when the "commercially marketable mineral product" for statutory percentage depletion allowance purposes was first obtained by an integrated miner-manufacturer. In that case the taxpayer owned an underground mine from which it produced fire clay and shale which was processed by the taxpayer into vitrified sewer pipe and related products. There, as in the instant case, the taxpayer contended that its depletion base was the sales price of its finished sewer pipe and related products. The Supreme Court, after reviewing the legislative history of depletion allowances, announced certain significant conclusions with reference to the determination of the depletion allowance base of an integrated miner-manufacturer. Whatever doubt, if any, that

3. Webster's New International Dictionary, Second Edition, Unabridged, among other definitions given, defines the verb "man- ufacture" as "To work, as raw or partly wrought materials, into suitable forms for use."

may have existed in the minds of some as to the holdings made or conclusions reached in Cannelton should have been cleared up and removed by Riddell v. Monolith Portland Cement Co., supra, wherein the Supreme Court clearly states what it held and concluded in Cannelton. The material facts in Monolith parallel closely the facts in this case. The taxpayer owned a quarry from which it extracted limestone, all of which was used in the manufacture of cement at its plant located nearby. The processes followed in making cement were those normally applied in the cement industry by cement manufacturers having deposits similar to that of the taxpayer. The trial court found that there was no market for the taxpayer's limestone until it was processed into finished cement and entered judgment awarding the taxpayer a depletion allowance computed on the sales price of its finished cement, which judgment was affirmed by the Court of Appeals for the Ninth Circuit (Riddell v. Monolith Portland Cement Co., 9 Cir., 301 F.2d 488). The Supreme Court, concluding that Cannelton controlled, reversed and held in effect that Monolith's first "commercially marketable mineral product" was crushed limestone, and that its allowance for depletion was limited to the constructive income received from such crushed limestone.

As pointed out by the Supreme Court in Monolith, two significant holdings made in Cannelton are: (1) that Congress intended to grant miners a depletion allowance based on constructive income from the raw mineral produced, if marketable in that form, and not on the value of the finished product, and (2) that the statutory percentage depletion allowance on the gross income of an integrated miner-manufacturer should be cut off at the point *where the mineral first became suitable for industrial use or consumption.* The latter is a holding to the effect that at the point where a mineral first becomes suitable for indus-

trial use or consumption, a "commercially marketable mineral product" has been obtained.

Longhorn's cement rock at the crushed stage, beyond question, was highly acceptable for industrial use or consumption, namely, for use in the manufacture of cement—the use that Longhorn and all other miners of cement rock in the United States made of crushed cement rock. Furthermore, there is no question but that Longhorn's cement rock was marketable in crushed form. As above pointed out, the undisputed evidence shows that large amounts of limestone, other than limestone of the cement rock variety, were sold annually in the United States to be used as the principal ingredient in the manufacture of cement. The fact that neither Longhorn nor any of the other miners of cement rock, each of whom used all of the cement rock it mined to manufacture cement as did Longhorn, sold to any other person its cement rock in crushed form or in any other form is immaterial to the question of marketability of cement rock in crushed form because, under the teachings of Cannelton, Longhorn is to be treated as though it sold its cement rock to itself for processing into cement. Longhorn was the market for its mineral.

■ Applying Cannelton and Monolith to the undisputed facts in this case, we find and conclude that the "commercially marketable mineral product" first obtained by Longhorn from its cement rock was such cement rock at the crushed stage, and that Longhorn's basis for its depletion allowance should have been limited to its constructive income from its cement rock at the crushed stage rather than from finished cement.[4]

■ Longhorn's alternative contention to the effect that its depletion allowance should be determined by the selling price of its finished cement minus the cost and proportional profits attributable to the processes it employs after obtain-

---

4. Also see United States v. Portland Cement Co. of Utah, 10 Cir., 315 F.2d 169, which involves the question of de-

pletion allowance on cement rock and is directly in point.

496

ing clinker is without merit. As above indicated, Sec. 114(b) (4) (B) of the Internal Revenue Code of 1939 provides in effect that the term "mining" as used in said Sec. 114 shall include not merely the extraction of minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product and further provides in part:

"The term 'ordinary treatment processes', as used herein, shall include the following: * * * (iii) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product —sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment;"

In asserting its alternative contention Longhorn relies on the provisions of Clause (iii) of said Sec. 114(b)–(4) (B) just quoted. Under the provisions of that clause "sintering" is considered an "ordinary treatment process" only when applied to minerals which are customarily sold in the form of a crude mineral product and only then when the "sintering" is done for the purpose of bringing the mineral to shipping grade and form. There is not the slightest evidence that any miner "sintered" limestone of any kind, including limestone of the cement rock variety, for the purpose of bringing the limestone to shipping grade and form. On the other hand, the record is replete with evidence that limestone, regardless of the purpose for which it was sold, was sold in the crushed limestone form without having been "sintered." While Longhorn "sintered" the cement rock it mined, it did so as one of the manufacturing processes in the manufacture of cement and did not do so to bring its cement rock to shipping grade and form. As hereinabove found and concluded, the commercially marketable mineral product first obtained by Longhorn from its cement rock was cement rock in the crushed stage. At the crushed stage said cement rock was in shipping grade and form.

The judgment of the district court is reversed and the cause remanded for disposition in accordance with this opinion.

Reversed and remanded.