PPG INDUSTRIES CANADA LTD., APPELLANT, v. GLENN W. KREUSCHER, DIRECTOR OF AGRICULTURE, STATE OF NEBRASKA, AND PAUL L. DOUGLAS, ATTORNEY GENERAL OF THE STATE OF NEBRASKA, APPELLEES.

281 N. W. 2d 762

Filed July 31, 1979. No. 42257.

Crosby, Guenzel, Davis, Kessner & Kuester, Donn E. Davis, for appellant.

Paul L. Douglas, Attorney General, and Robert F. Bartle, for appellees.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

KRIVOSHA, C. J.

This is an appeal from a decision of the District Court for Lancaster County, Nebraska, determining that plaintiff herein was subject to the provisions of the Nebraska Commercial Fertilizer and Soil Conditioner Act, sections 81-2,162.01 et seq., R. R. S. 1943, as amended (the Act). For the reasons set out herein we find that the plaintiff is not subject to the

provisions of the Nebraska Commercial Fertilizer and Soil Conditioner Act, and reverse and remand the trial court's decree.

Plaintiff (PPG) is a Canadian corporation involved in the mining and processing of potash through a division known as Kalium Chemicals. Kalium mines its potash at a site near Regina, Saskatchewan, Canada. It has no mines in the United States and all Kalium potash is shipped by Kalium to its customers in interstate commerce. Customers of PPG include "national accounts which are major corporations," "independent accounts which are smaller companies, some of which only have 1 plant, or maybe 2 or 3 plants," and "industrial accounts which use potash for things other than agricultural purposes." PPG attempts to sell its chemical only to fertilizer manufacturers who in turn combine PPG's potash with one or more of the plant food elements, such as phosphate or nitrogen. PPG sells no potash to the ultimate consumer in Nebraska and has no facilities or outlets for distribution within the state.

PPG sells its potash products to several companies located outside Nebraska which direct PPG to ship the products to companies, including fertilizer manufacturers located within Nebraska. These customers include Land-O-Lakes, Inc., of Fort Dodge, Iowa, and Farmland Industries of Kansas City, Missouri. Those companies are, under the Department of Agriculture's present interpretation of the Act, required to register with the State of Nebraska the potash they have purchased from PPG and from other suppliers, and they have in fact done so.

While there was some evidence that potash is occasionally applied to the ground without being mixed or blended, the evidence clearly established that PPG's customers who purchased potash were not the ultimate consumer and did not sell the product in the form in which they had received it from PPG, but rather in 99 percent of the cases cus-

tom blended the product or in some other manner mixed the potash with other chemicals.

PPG assigns several errors, including: (1) That the District Court erred in failing to hold that the specific provisions of the Act, and the actual regulatory scheme contemplated by the Act, evidenced the Legislature's intent that companies, such as PPG, selling a product that may be used by other manufacturers to produce fertilizer, but which had no instate facilities, were not to be directly regulated under the Act; and (2) that the District Court erred in holding that PPG "distributes commercial fertilizer" within the meaning of the Act in Nebraska. Several other assignments of error are raised, but in view of our decision in this case they need not be considered.

As noted by the trial court in its memorandum opinion, the Act is not a model of legislative draftsmanship and leaves much to be desired. An understanding of the problem, however, requires that we take the time to go through the Act as best we can. Section 81-2,162.02, R. S. Supp., 1978, defines the terms of the Act. Included in the definition is one for "commercial fertilizer," which is defined by the Act to mean: "* * * any formula or product distributed, except unmanipulated animal and vegetable manures, which contains one or more plant nutrients recognized by the Association of American Plant Food Control Officials in its official publication, which nutrients are used for their plant nutrient content and are intended to promote plant growth." § 81-2,162.02 (3), R. S. Supp., 1978. It is important here to note that the definition refers to "product distributed." The definition section further defines "distribute" to mean: "[T]o offer for sale, sell, barter, or otherwise supply commercial fertilizers or soil conditioners." § 81-2,162.02 (6), R. S. Supp., 1978. "Product" under the Act is defined to mean: "[B]oth commercial fertilizers and soil conditioners." § 81-2,162.02 (11), R. S. Supp., 1978. The statu-

tory definition of the word "product," while ultimately important to the determination of this matter, is of little help in that it appears to simply refer back to commercial fertilizers and soil conditioners which likewise contain within their definition reference to the word "product." We therefore have a situation in which a statutory term is defined by another definition.

One further definition of particular significance in the analysis of this Act is the definition of "custom blended product," which is defined under the Act to mean "any individually compounded commercial fertilizer or soil conditioner mixed, blended, offered for sale or sold in Nebraska to a person's specifications, when such person is the ultimate consumer; *Provided,* that the *ingredients* used in such product which are subject to the registration requirements of section 81-2,162.03 shall have been so registered." (Emphasis supplied.) § 81-2,162.02 (5), R. S. Supp., 1978.

The substance of the Act deals with two specific matters: (1) A requirement that the "product" be registered; and (2) that the manufacturer's or distributor's "facility" be registered.

The Act then provides that: "Each commercial fertilizer and soil conditioner shall be registered before being distributed in this state * * *." § 81-2,162.03, R. R. S. 1943. The Act does not, however, indicate *who* is supposed to be responsible for registering the fertilizer before distributing it in the state.

Section 81-2,162.06, R. S. Supp., 1978, establishes a procedure for the payment of an inspection fee on all registered fertilizer distributed in this state. Subsection (3) of section 81-2,162.06, R. S. Supp., 1978, provides: "Every person who distributes commercial fertilizer or soil conditioners *to the consumer* in this state shall file, not later than the last day of January and July of each year, a semiannual tonnage report on forms provided by the department setting

forth the number of net tons of commercial fertilizer and soil conditioners distributed in this state during the preceding six months' period, which report shall cover the periods from July 1 to December 31 and January 1 to June 30 * * * and upon filing such report shall pay the inspection fee at the rate stated in subsection (1) of this section." (Emphasis supplied.) Subsection (4) of the same section, however, provides: "When *more* than one person distributes a commercial fertilizer or soil conditioner in this state, the person who registers the product shall be responsible for the requirements of subsection (3) of this section." (Emphasis supplied.) However, as noted earlier, the Act does not indicate who it is that is responsible for registering the product.

In this case, the Department of Agriculture insists that PPG must register the raw product and refuses to permit the in-state manufacturer or distributor from registering even if he is willing to do so. PPG is left in the difficult position of either complying with the wishes of the Department of Agriculture or facing criminal prosecution. The failure to comply with the provisions of the Act, including the registration of the product and the facility, constitutes a criminal offense punishable as a Class II misdemeanor. § 81-2,162.17, R. S. Supp., 1978. The significance of that section is readily apparent. If we read the Act as suggested by the State, we have a criminal statute based upon a host of ambiguities which in turn might compel us to void the entire Act. Criminal prosecution cannot be grounded on nebulous definitions of crime. All crimes are statutory in this state. The validity of a statute purporting to define a crime cannot be based on an indefinite, uncertain, and obscure basis of validity. See Lincoln Dairy Co. v. Finigan, 170 Neb. 777, 104 N. W. 2d 227. Likewise, a criminal prosecution cannot be grounded on a nebulous definition of who the offender is. We fail to see how or in what manner the Department of

Agriculture can enforce the Act without acting unreasonably, arbitrarily, or capriciously. By interpreting the Act in a reasonable manner, however, we may be able to uphold its constitutionality, and where given that choice we should do whatever is reasonable to give the Act a constitutional interpretation. See, Bodenstedt v. Rickers, 189 Neb. 407, 203 N. W. 2d 110; Prendergast v. Nelson, 199 Neb. 97, 256 N. W. 2d 657.

Through the provisions of section 81-2,162.03 (2), R. R. S. 1943, custom blended products are said to be exempt from the requirements of registration, although by definition in section 81-2,162.02 (5), R. S. Supp., 1978, custom blended products are by definition made from ingredients which must be registered. Furthermore, section 81-2,162.03 (2), R. R. S. 1943, provides that although the custom blended product is exempt from registration (except as required by definition), the ingredients are "subject to the inspection fee requirements of section 81-2,162.06, except those ingredients brought to the manufacturer by the ultimate consumer for custom blending."

Further, section 81-2,162.23, R. S. Supp., 1978, in part, provides: "No person shall manufacture or distribute commercial fertilizers or soil conditioners in this state unless such person holds a valid registration for each manufacturing and distribution facility in this state. Any out-of-state manufacturer or distributor who has no distribution facility within this state shall obtain a registration for his *principal outlet* used for distributing products in this state." (Emphasis supplied.) To suggest that the provisions of the Act are a myriad of confusion is to give the Act the benefit of the doubt. Nevertheless, we must attempt, if possible, to bring some order out of this chaos. In order to do that, it appears that a determination with regard to three specific words used in the Act must be reached. Does the word "man-

ufacturer" encompass the nonresident supplier of raw material, or is it intended to describe the individual who produces for sale the final fertilizer product? Likewise, does the word "product" include in its definition ingredients supplied by a mining company to a local manufacturer, or is the word "product" intended to refer to the *final* product purchased by the ultimate consumer and placed upon the land? And, finally, does the term "distribute" include one who supplies raw materials to a local manufacturer? In attempting to determine those meanings we are fortunately aided by certain long-established and well-recognized rules of statutory construction.

Where the language used in a statute is ambiguous, recourse should be had to the legislative purposes. Wang v. Board of Education, 199 Neb. 564, 260 N. W. 2d 475. The reasons for the enactment of a statute and the purposes and objects of an act may be guides in an attempt to give effect to the main intent of lawmakers. State v. Jennings, 195 Neb. 434, 238 N. W. 2d 477. To ascertain the intent of the Legislature, we examine the legislative history of the act in question. Norden Laboratories, Inc. v. County Board of Equalization, 189 Neb. 437, 203 N. W. 2d 152. The court, in considering the meaning of its statute, should, if possible, discover the legislative intent from the language of the act and give it effect. Pelzer v. City of Bellevue, 198 Neb. 19, 251 N. W. 2d 662. Where, because a statute is ambiguous, it is necessary to construe it, the principal objective is to determine the legislative intention. Matzke v. City of Seward, 193 Neb. 211, 226 N. W. 2d 340. The legislative intention is to be determined from the general consideration of the whole act with reference to the subject matter to which it applies and the particular topic under which the language in question is found, and the intent deduced from the whole will prevail over that of a particular part considered

separately. Equal Opportunity Commission v. Weyerhaeuser Co., 198 Neb. 104, 251 N. W. 2d 730. All the rules should be considered when it is necessary to construe a statute, and no particular rule should be followed to the exclusion of all others. Equal Opportunity Commission v. Weyerhaeuser, *supra*. To ascertain such intent, a court will not examine an operative provision without likewise examining the statute as a whole in the light of objects and purposes of the act. King v. School Dist. of Omaha, 197 Neb. 303, 248 N. W. 2d 752. A primary rule of construction is that the intention of the Legislature is to be found in the ordinary meaning of the words of a statute in the connection in which they are used and in light of the mischief to be remedied. Tom & Jerry, Inc. v. Nebraska Liquor Control Commission, 183 Neb. 410, 160 N. W. 2d 232. When the intent of the Legislature is clear, it is the duty of the courts to construe it in accordance with such intent. A sensible construction will be placed upon it to effectuate the object of the legislation rather than a literal meaning that would have the effect of defeating the legislative intent. Keller v. State, 184 Neb. 853, 172 N. W. 2d 782. A word or phrase repeated in a statute will bear the same meaning throughout the statute, unless a different intention appears. Anderson v. Carlson, 171 Neb. 741, 107 N. W. 2d 535. With those statutory aids now in hand, we proceed to attempt to work our way through the statutory maze.

The evidence in this case is virtually without controversy to the effect that PPG maintains no manufacturing facilities in this state. The potash is removed from the ground and placed in train cars. No processing is done to or with the potash. It is without controversy that PPG has no distribution facility in the State of Nebraska, and delivers all of its potash to various manufacturers within Nebraska in bulk on railroad cars, although occasionally some may be delivered by truck. PPG likewise has no

principal outlet used for distributing products in this state. The records in this case indicate that plaintiff sold potash to various fertilizing manufacturers or distributors, both within and without the State of Nebraska, and could not in any manner ascertain who was the principal outlet in order to comply with section 81-2,162.23, R. S. Supp., 1978. Moreover, the evidence is clear, beyond question, that none of the customers of the plaintiff constituted an outlet, principal or otherwise, for distributing products of the plaintiff in this state. Customers who purchased potash from any outlet in the state were totally unaware of whether the potash came from the plaintiff's mine or from other potash miners, and as a matter of fact the evidence indicates that manufacturers and distributors in the state do in fact purchase from more than one mining company, may commingle the raw potash upon arrival in Nebraska, and certainly destroy the identity of the product. It is difficult to imagine whether any consumer in Nebraska is aware that he purchased potash from the plaintiff's mine when purchasing from Farmland Industries or any other co-op.

An examination of the history which resulted in the adoption of the Act and its amendments, makes it clear that the Legislature was attempting to adopt a consumer protection act. The purpose of the Act was to protect ultimate consumers from purchasing fertilizer which was represented to contain certain chemicals but which in fact did not. The Act was intended to make sure that consumers were not defrauded by unscrupulous manufacturers of finished fertilizer product, and was not intended to reach out and affect each and every producer of raw material.

The State in its brief argues that regardless of whether the product of the plaintiff herein is considered as a "consumer product" or only as an "ingredient," it is intended to be covered by the Act. That

conclusion is difficult to reach when one attempts to review the Act.

One may ask what is the purpose of requiring that a place of manufacture or distribution within the state be registered, or, if no place of manufacture or distribution be maintained within the state, that a principal outlet used for distributing the product be registered. The purpose obviously is to provide the state with information as to where they may go to inspect and test the product if they are uncertain whether it is in fact what it is represented to be. How could that possibly be accomplished if the product is commingled with all other products of other potash producers prior to being blended? What possible benefit could be served the state by permitting them to know that Farmland Industries, as an example, has a pile of potash which it uses to manufacture finished product. The inspector could not in any manner accomplish the intent of the Act.

Furthermore, the evidence makes it clear that the mining company does not warrant the quality of the potash in advance, and could not so register it. Each load of potash as it is sold is tested just prior to shipment so that the purchaser can be billed for the proper content, and so that the local manufacturer will know the exact amount of potash to blend with nitrogen and phosphates to obtain the proper blend of the three ingredients for its customers. Under that basis, each carload of potash would have to be separately registered with the Department of Agriculture, even though the plaintiff in this case made no representations or warranties, expressed or implied, to the ultimate consumer as to the quality of the product.

It seems that the intent of the Legislature was clear that it was "finished product" which they were seeking to regulate and not raw material ingredients.

Likewise, the reference to "manufacturer" appears

from an overall examination of the Act to mean that individual who combines raw product into a finished fertilizer. Section 81-2,162.03, R. R. S. 1943, after requiring that each commercial fertilizer and soil conditioner be registered before distribution, sets out the information which must be provided on the application, including information such as (a) the name and principal address of the person guaranteeing the product; (b) the name and principal address of the person manufacturing the product; and (c) the name and principal address of the person whose name appears on the label.

Subsection (2) of that section then provides that custom blended products are exempt from the requirements of registration, provided "such products shall bear a tag or invoice stating the name and principal address of the manufacturer, name and address of the purchaser * * *." If the word "manufacturer" in this case is intended to mean the plaintiff, then the "purchaser" must be the distributor or local manufacturer. What possible benefit could there be to the consumer to have that information? Obviously, the purpose of the information is to permit an inspector in the field to ascertain whether or not this product, that was custom blended, was made for the particular individual having possession of the exempted product and the name of the party blending the product so that if a violation was found, the state would know where to turn. What purpose could be served by totally exempting the custom blender and holding only the miner responsible? Likewise, in ordinary parlance, a "manufacturer" is someone other than the supplier of raw material. To "manufacture" is generally defined as making something from raw materials; the processing of a finished product from raw materials. See, Webster's Third New International Dictionary, p. 1378 (1968); United States v. Longhorn Portland Cement Company, 328 F. 2d 491 (5th Cir., 1964); Comptroller of

the Treasury v. American Can Co., 208 Md. 203, 117 A. 2d 559; Duke Power Co. v. Clayton, Comr. of Revenue, 274 N. C. 505, 164 S. E. 2d 289; Wauwatosa v. Strudell, 6 Wis. 2d 450, 95 N. W. 2d 257. Manufacturer here obviously means the manufacturer of a finished fertilizer or soil conditioner.

In section 81-2,162.05 (2), R. S. Supp., 1978, the requirement is made that if the product is "distributed in bulk," a written or printed statement containing information about the product must accompany delivery and be supplied to the "purchaser." Again, is this purchaser the resident manufacturer or distributor, or is it the ultimate consumer? If it is thought to be the ultimate consumer, it makes little sense to require that the Canadian mining company provide multiple copies attached to the side of a freight car for distribution to multiple purchasers out of a commingled pile. Obviously, the word "purchaser" refers to the ultimate consumer, and the sale in bulk must mean from the local manufacturer or distributor.

Section 81-2,162.06, R. S. Supp., 1978, further establishes that intent. After establishing a requirement for the payment of a fee, that section provides, "*Provided,* that sales to *manufacturers* or exchanges between them are hereby exempted." (Emphasis supplied.) Can this language mean then that sales to the plaintiff in Canada are exempt? Who would sell to the producer? Obviously, the word "manufacturer" in this case must mean the party putting together the finished product. Likewise, subsection (3) establishes the amount of fee to be paid based upon sales distributed in the state. How could the plaintiff ever ascertain what was being distributed to consumers in this state? The intent of the Legislature to regulate a finished product by the Act is further made clear by the provisions of section 81-2,162.06 (4), R. S. Supp., 1978. That section provides that where more than one person distributes a commercial fertilizer in this state, the person who

registers the product shall be responsible for the payment; but if "distributes" means simply selling the raw material in the state, then there is not more than one person distributing in this state in this case, and we are back to subsection (3) of section 81-2,162.06, R. S. Supp., 1978.

As pointed out by the plaintiff, the issue in this case is not whether plaintiff's products, when used to manufacture fertilizers in Nebraska, cannot or should not be regulated by the Nebraska Department of Agriculture. Rather, the question is whether the plaintiff must register and pay the fee or whether the manufacturer or distributor of the final product should be required to register and pay the fee. We believe the intent of the Legislature and the clear meaning of the Act require us to opt for the latter. To hold otherwise only makes the entire Act a meaningless exercise in futility and serves no purpose in providing consumer protection.

We therefore hold that "product" under the Nebraska Fertilizer and Soil Conditioner Act means the product which is sold in the normal course of business to the ultimate consumer, and consists of the finished product; that likewise "manufacturer" under the Act means the manufacturer of the finished product; and that "distributes" means distribution of a finished product, and not a mere ingredient.

If plaintiff should engage in intentionally distributing a finished product in Nebraska for use by an ultimate consumer without the intervention of another processor, such product might require registration under the Act. The evidence does not indicate that to be the situation.

The record discloses that the Department of Agriculture issued "stop-sale" orders to a number of plaintiff's customers because plaintiff had not registered under the provisions of the Act. The issuance of a "stop-sale" order is an extreme remedy and affects not only the party against whom the action is

directed, but most often innocent purchasers as well. Moreover, oftentimes the damage done by such an order can never be corrected even if the state is later found to be wrong. The parties against whom the "stop-sale" orders are directed are afforded virtually no due process before action is taken and have little, if any, way to be made whole either because the product must be sold within a specific time or must be used within a specific time.

It would appear to be a better practice to reserve the use of "stop-sale" orders to those cases when the public health, safety, and welfare is in danger and not when the violation is failure to register even though the product is what it claims to be and does not cause harm if used. In this case, the local manufacturer and the local farmers were denied the use and benefit of the potash. The state could have recovered its fees at any time the controversy was settled, and did not need to resort to so extreme a remedy.

We therefore hold that the Act does not require the plaintiff herein to register its raw material sold to in-state manufacturers or processors who in turn process the ingredient into a final product. The judgment of the District Court is therefore reversed and the cause remanded with instructions to enter a judgment in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.